## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Frank P. Hammes and Jean Feehan

       Plaintiffs,

v.

Yamaha Motor Corporation U.S.A., Inc.,
A/K/A/ Yamaha Motor Corporation, USA,
a Wholly-Owned Subsidiary of Yamaha
Motor Corporation, a California
Corporation, and Yamaha Motor
Co., Ltd., a Japanese Corporation,

       Defendants.

**MEMORANDUM OF
LAW AND ORDER**
Civil File No.03-6456 (MJD/JSM)

_____

James P. Ryan, Jr. and DeAnna J. Schleusner, Ryan & Grinde, Ltd., Counsel for
Plaintiffs.
Brian N. Johnson, Cortney G. Sylvester and Cynthia P. Arends, Halleland Lewis
Nilan & Johnson P.A., Counsel for Defendants.

_____

## I.   INTRODUCTION

    This case is before the Court on Defendants' motions for summary judgment

and to exclude Plaintiffs' expert testimony.  Plaintiffs' Amended Complaint alleges

Defendants are liable under theories of negligence, strict liability, loss of

consortium, and breach of warranties for injuries sustained while riding a Yamaha

motorcycle.   The Court heard oral arguments on January 31, 2006.

## II.   FACTUAL BACKGROUND

Plaintiff, Frank Hammes, a Minnesota resident, purchased a Yamaha YZ125 motorcycle on June 7, 2001.  On July 26, 2001, Hammes crashed his motorcycle while riding with his son, Lance, on a motocross track located on his property. The accident occurred when Hammes approached a jump and attempted to decelerate or "throttle down" but instead the motorcycle revved up and "took off like a rocket."  (Hammes Dep. 90-91.)  After the accident the bike lay on its left side and the engine was still revving.  Lance Hammes went to the bike and hit the "kill" switch to turn the engine off.  Hammes stated that he could hear the motorcycle still "[r]unning fast, like three-quarters throttle."  (Id. at 122.)  Lance testified that when he approached the bike the engine was revving at a very high rpm because it was "still wide open."  (Lance Hammes Dep. 37.)

Hammes brought the motorcycle to Cycle Pro to be sold sometime later.  At that time, Hammes told Dan Vandal, a Cycle Pro employee, that the "throttle had stuck and that's what made it crash."  (Vandal Dep. 14-15.)  The person who ultimately bought Hammes' bike, Scott Bailey, experienced a similar problem with the bike when the motor revved at a high rate and the bike "took off."  (Bailey Dep. 64.)

In September 2001, Yamaha issued a recall for its YZ250 and YZ125

2

motorcycles due to a potential problem with the throttle cable dislodging from the rotor and "sticking." Yamaha instituted this recall after receiving complaints from riders who had experienced problems with their throttles sticking.

The first complaints came in August 2000 when a group of professional riders on a Yamaha team experienced problems with their throttle cables derailing from their grooves and causing the throttles to stick. Each of these riders drove a YZ250 model. The YZ250 and YZ125 models used the same throttle mechanism and design. (Watson Dep. 33.) The complaints noted that at least five riders had experienced similar problems. In some of these circumstances, when the bikes were dismantled, the cable was found physically dislodged from its groove. (Sylvester Aff. II, Ex. C.) Based on the complaints, Yamaha Japan conducted a series of tests, ultimately determining that there was no risk to the general consuming public because the problems were experienced by professional racers who were harder on their bikes and in some cases had altered the "free play" of the throttle. (Watson Dep. 38.) Yamaha called these tests "inconclusive" as the testers were unsuccessful at replicating the alleged problem. (Negishi Dep. 60.)

Another rider made a similar complaint in June 2001 regarding a YZ250. This rider, however, was not a professional but had experienced a throttle sticking problem like the professional riders. His motorcycle was inspected, which led to additional testing by Yamaha and ultimately resulted in a recall. The Yamaha

Customer Service logs note that Yamaha received a number of call-ins to customer service regarding throttle problems including as a Yamaha employee described it, "one gentleman saying, hey, I want to let you know that I had an accident, I got hurt, and I took my throttle apart and the cable was out." (Watson Dep. 38.) It is unclear when this complaint was made.

## III.   PROCEDURAL HISTORY

Hammes brought this action against Yamaha, alleging four counts: negligent design and warning; strict liability regarding the design and manufacture of the motorcycle; breach of express and implied warranties that the product was free of defects; and loss of consortium. Four experts have investigated Hammes' claims and are prepared to testify. Yamaha moves to exclude all four experts and for summary judgment on all counts.

## IV.   ARGUMENTS OF THE PARTIES

### A.   <u>Motion to Exclude Expert Testimony</u>

Yamaha moves to exclude the testimony of four of Hammes' experts, Lanny R. Berke, Gary Kmiecik, Jon Coleman, and Dr. Paul Estenson.

#### 1.   <u>Legal Standard</u>

Generally, all relevant evidence is admissible. Fed. R. Evid. 402. Relevant

evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The proponent of the testimony has the burden to show by a preponderance of the evidence that the testimony is admissible under Rule 702. Lauzon v. Senco Prod., Inc., 270 F.3d 681, 686 (8th Cir. 2001). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court addressed the admissibility of scientific expert testimony in Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993). In a subsequent case, Kumho Tire Co. v Carmichael, the Supreme Court extended the Daubert analysis to all expert testimony. 526 U.S. 137 (1999).

In determining whether expert testimony should be admitted, the trial court acts as a gatekeeper "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 141. Admissible expert testimony is (1) offered by a qualified expert; (2) reliable; and (3) relevant such that it "will assist the trier of fact to understand the evidence or determine a

fact in issue." United States v. Susan Wintermute, Nos. 05-2433, 04-4083, slip op. at 8-9 (8th Cir. Apr. 11, 2006) (quotation omitted).

The relevant reliability inquiry should be flexible with the subject being validity and reliability. Kumho Tire, 526 U.S. at 138. Determining reliability "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (citation omitted). While the district court has broad discretion to admit or exclude expert testimony, "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Clark v. Heidrick, M.D., 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted).

### 2.    Lanny R. Berke

Berke intends to testify to the following issues: (1) that the motorcycle lacked proper and safe design; (2) that Yamaha failed to conduct sufficient testing; (3) that Yamaha did not act in a timely manner when notified about the

6

throttle problem; (4) that Yamaha has a poor complaint tracking system; and (5) that Yamaha should have notified consumers about the safety issues regarding the throttle problem.  (Sylvester Aff. Sept. 30, 2005, Ex. B.)

### a.     That the Motorcycle Lacked Safe Design

Berke is a trained engineer with a Bachelor of Mechanical Engineering degree from the University of Minnesota.  (Id. at 8.)  During his career he has been a Safety Specialist, a Product Safety Specialist, a Manufacturing Technology Specialist, a Design Engineer, and an independent safety consultant for private industry, insurance companies, and attorneys.  (Id.)  The Court finds that Berke is sufficiently qualified in the area of product design and product safety to testify about the design of the throttle/rotor of the Yamaha YZ 125.

While Berke does not have experience with motorcycle design in general, he does have specific experience with rotors, which are used in many mechanical devices.  It is not necessary to ride a motorcycle or to work in the motorcycle industry to understand the rotor.  Berke derives his opinion from general engineering principles of rotor design of which he is well studied.  The weakness in Berke's opinion and expertise go to the weight to be given his testimony, not its admissibility.  Fox v. Dannenberg, 906 F.2d 1253, 1256-57 (8th Cir. 1990).  Accordingly, the Court finds that Berke is qualified to render an opinion as to whether the motorcycle was properly designed.

The Court's analysis does not end at whether Berke is qualified.  Hammes, the proponent of the testimony, must also show that Berke's testimony is reliable under Rule 702.  Yamaha asserts that Berke's testimony should be excluded because he did not conduct a proper investigation of his theory and it is therefore scientifically unreliable.

Berke's expert opinion is based on his review of all file and discovery documents and two physical examinations of the motorcycle.  During the second physical examination of the motorcycle, Berke inspected the rotor at a high level of magnification and documented the result with photographs taken at the University of Minnesota.  (Berke Dep. 11-14.)

Berke's opinion is sufficiently reliable to satisfy Rule 702.  Although the evidence relating to Yamaha's recall may not be admissible at trial, Berke may properly depend in part on the evidence surrounding the recall, including tests and reports created by Yamaha employees, to conclude that the product at issue was unsafe.  U.S. v. Carter, 270 F.3d 731, 735 (8th Cir. 2001) ("Rule 703 of the Federal Rules of Evidence permits experts to rely upon inadmissible facts or data in forming opinions or inferences, if of a type reasonably relied upon by experts in a particular field").  Here, absent any evidence to the contrary, the Court finds that other engineering experts would reasonably rely on the tests performed by Yamaha's safety experts.  Notably, Berke does not base his opinion solely on

evidence that a recall was performed.  He also conducted two visual inspections of the motorcycle and reviewed other witness testimony in this case.

Furthermore, the Court finds that Berke's investigation, which was based on his experience and expertise in product design, was undertaken in a reliable manner.  Berke was not required to rule out other possible causes before reaching his conclusion that the motorcycle lacked safe design.  Marvin Lumber & Cedar Co. v. PPG Indus., 401 F.3d 901, 916 (8th Cir. 2005).  Nor was Berke required to base his opinion on specific treatises when his opinion was derived from observations based on extensive experience.  Kumho, 525 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); See also Tassin v. Sears Roebuck, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"); Kumho, 525 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  Here, the Court finds that Berke reasonably relied on witness deposition testimony, his engineering/design experience, visual observations, and discovery produced by Yamaha to arrive at

9

his conclusions.  Berke's identification of "witness marks"[1] provides a reasonable link between the information available to him and his conclusion regarding the motorcycle's design.  Challenges to Berke's failure to identify the witness marks upon a first examination, and to the size or characteristics of the marks may be addressed at trial.  "The factual basis of an expert opinion goes to the credibility of testimony, not the admissibility," and can be sufficiently addressed on cross-examination.  <u>Marvin Lumber</u>, 401 F.3d at 916.  Similarly, the fact that Berke did not attempt to recreate the throttle derailment does not undermine Berke's opinion as he had based his opinion in part on the Yamaha documents denoting that they had been unsuccessful at recreating the problem.

Accordingly, Berke's testimony regarding the rotor's design is admissible because it is relevant, Berke is well-qualified, and his methodology is sufficiently reliable to comply with Rule 702.

### b.   That Yamaha Failed to Conduct Sufficient Testing

Berke intends to offer an opinion that Yamaha failed to conduct sufficient testing of the YZ125 motorcycle.  Yamaha challenges Berke's opinion because it is based entirely on the absence of testing documents, which he interpreted to mean that Yamaha did no testing of the throttle assembly.  These documents did exist,

---

[1]The Court understands witness marks to be minute cuts, caused by the rotor cable, that should appear on a rotor housing if a throttle cable had derailed.

but were not produced to Plaintiffs because they were not due until after Berke completed his expert report.

The Court finds that Berke's testimony regarding the sufficiency of Yamaha's testing meets the standard set forth in Rule 702 and should be allowed in.  As set forth above, Berke is trained in the area of product safety and safety analysis and is qualified to render an opinion regarding the sufficiency of Yamaha's tests.  Berke noted in his depositions that there are certain industry standard tests that he would expect to have been performed.  His observations as to which tests are expected by industry standards are based on his experience in the area of product safety and are sufficiently reliable to satisfy Rule 702.  Yamaha can properly challenge Berke's factual basis regarding the existence of testing reports during cross examination.

### c.    That Yamaha Did Not Respond in a Timely Manner to Complaints

Berke gives the opinion that "Yamaha did not act in a timely and responsible manner" when they were notified on August 8, 2000, that they had a throttle problem and that this slow response was a "direct cause of the subject accident."  (Schleusner Aff. Nov. 9, 2005, Ex. L.)

The Court finds that Berke is qualified to offer the challenged testimony.  Berke's opinion is based on his extensive experience being directly involved in the safety analysis of products including conducting hazard analysis and safety studies

11

of many 3M products and teaching a class that specifically discusses how to prepare for and conduct a recall.  (Berke Aff. 4.)  Further, Berke has acted as a consultant regarding the institution of recalls in at least two instances.  (Berke Dep. 46-50.)

The Court further determines that Berke's testimony meets the other requirements of admissibility.  Namely, Berke's testimony is relevant and his methodology is sufficiently reliable to pass muster under Rule 702.

Berke's testimony is relevant.  Yamaha contends that the testimony is not relevant since Minnesota does not recognize a cause of action for failure to recall. However, Berke's testimony discusses his opinion that Yamaha should have "responded" to complaints.  Altering a warning or providing notice to customers, the subject of the negligent failure to warn cause of action, is also a "response." Thus, Berke's testimony has a tendency to make a fact of consequence more or less probable and is relevant to this matter.

Yamaha's primary objection to this testimony is based upon Berke's interpretation of the evidence that Yamaha received notice of throttle problems in 2000.  This is primarily a factual dispute over which experts could reasonably disagree and does not undermine the reliability of Berke's opinion.  His opinions are based on legitimate interpretations of the facts and Yamaha's disputed version is not a sufficient basis to exclude Berke's expert testimony.  Yamaha can properly

challenge these opinions during cross examination.

### iv.     That Yamaha Had a Poor Complaint Tracking System

Berke intends to offer the opinion that Yamaha's complaint tracking system was poor.  The Court finds that this opinion is inadmissible as Berke is not qualified as an expert in the area of complaint tracking and that he has not based his conclusions on reliable methodology.

Although Berke testified that he has participated in the implementation of a complaint tracking system, he refused to give any company names or details about his duties in that respect.  (Berke Dep. 101-104.)  Berke's curriculum vitae identifies him as an engineer and as a safety specialist, but does not include any credentials which qualify him as an expert in the area of complaint tracking and information flow within a corporation.  Even if the Court were to find that Berke's limited experience with complaint tracking qualified him as an expert, Berke has applied unreliable methodology in this case and his testimony must be excluded.

Berke admitted that he had no knowledge of what Yamaha's complaint tracking system entails.  (Berke Dep. 101.)  Berke also stated that he does not have an opinion as to what a complaint tracking system should entail.  (Id. at 102.)  Instead, he stated only that it should be "something different than this," and should be "more effective than it is now."  (Id.)  Daubert and Rule 702 require more exacting standards from an expert as this opinion is not based on the

"sufficient facts or data," they contemplated.  The Court expects at a minimum that Berke would have made himself familiar with industry standards for complaint tracking before offering an opinion that Yamaha's system was inadequate.  Hammes, the proponent of the expert testimony, has not shown by a preponderance of the evidence that Berke's opinion is reliable.  Accordingly, Berke's testimony that Yamaha's complaint tracking system was inadequate is excluded.

### v.    That Yamaha Should Have Notified Consumers Earlier

Berke states that Yamaha should have notified consumers of the potential defects earlier than it did in this case.  The Court finds that this statement complies with Rule 702 and is admissible.

Berke's experience encompasses giving advice to manufacturers about when to stop selling unsafe products and the Court determines that he is qualified as an expert in this area.  (Berke Aff. 4.)  Berke bases his opinion on his accumulated understanding that it is appropriate for a manufacturer to consider the severity of possible injuries when determining how to respond to potential product defects. In this case, Berke opines that the risk of injury required Yamaha to respond as quickly as possible.  The Court finds that Berke's history and knowledge in the area of product safety as applied to his observations regarding Yamaha's response are sufficiently reliable and relevant to comply with Rule 702.  Yamaha may

present competing examples of industry standards at trial to challenge Berke's expert opinion.

### 3. <u>Gary Kmiecik</u>

Kmiecik intends to offer the following opinions: (1)the throttle stuck on Hammes' motorcycle because of improper design; (2) the accident would not have happened if Yamaha had designed the rotor properly; and (3) a description of the "accident scenario." (Sylvester Aff. Ex. D.)

### a. **That the Throttle Stuck Because of Flawed Design**

Kmiecik has experience with motorcycle repair, traffic accident reconstruction, accident expert testimony, and motorcycle safety instruction. (Schleusner Aff. Ex. M.)  He has taken the following relevant courses: the Harley Davidson Service School, Suzuki Dealer Management Seminar, Suzuki Motorcycle General Tech Training, Suzuki Engine Technology II, and BMW technician certification.  (<u>Id.</u>)

Based on the qualifications set forth above, that Court finds that Kmiecik does not possess the requisite qualifications to give the ultimate opinion he offers, namely that the throttle of Hammes' motorcycle stuck because of a flawed design.

Kmiecik may be a well-qualified mechanic but he is not qualified to render an opinion in the area of product design.  <u>See</u> <u>Bogosian v. Mercedes-Benz of N. Am.</u>, 104 F.3d 472, 477-79 (1st Cir. 1997).  An expert may be qualified to testify

about certain aspects of a case, but not others.  Wheeling Pittsburgh Steel Corp. v.
Beelman River Terminals, Inc., 254 F.3d 706, 715-16 (8th Cir. 2001) (holding that
although a hydrologist was qualified as an expert on flood risk management, he
was not qualified as an expert on safe warehousing practices in the event of a
flood); Robertson v. Norton Co., 148 F.3d 905, 907 (8th Cir. 1998) (an expert was
"undoubtedly qualified to testify about a manufacturing defect in an exploding
ceramic grinding wheel," but not qualified to testify about grinding wheel
warnings).

Kmiecik is not qualified in product design, is not an engineer, and does not
offer any explanation behind this opinion.  His only knowledge of the
throttle/rotor design appears to be from Yamaha's recall notice to consumers and
the testimony of witnesses at the scene.  This notice alone cannot lead to a
reliable conclusion that a sticking throttle caused the accident at issue.  Kmiecik
himself admitted that one could not conclude solely by the behavior of the
motorcycle that the throttle was stuck.  In his deposition, Kmiecik engaged in the
following exchange with counsel: "Q: I understand that.  But I'm saying that just
looking at how the motorcycle itself behaved, you can't conclude from that fact
alone that the throttle was stuck.  Isn't that true?  Kmiecik: That's true."  (Kmiecik
Dep. 112.)  These conclusions are outside Kmiecik's area of expertise.  Because
Kmiecik has no experience designing or design-testing motorcycles, he has

insufficient "knowledge, skill, experience, training, or education" to offer a reliable

opinion on the alleged design flaws in this case.  Fed. R. Evid. 702.

### b.    That the Accident Would Not Have Happened But For the Improper Design of the Rotor

Kmiecik's opinion that the accident would not have happened but for the

improper design of the rotor similarly calls for expert knowledge regarding

product design.  As set forth above, Kmiecik is unqualified to render an opinion on

the design characteristics of the motorcycle at issue.  Accordingly, Kmiecik's

testimony regarding the causality of the accident is excluded.

### c.    The Accident Scenario

After concluding that Kmiecik's opinions regarding the cause of the

accident are excluded, only his accident scenario remains.  This testimony does

not take the form of an opinion, but merely a recitation of Hammes' description of

the accident.  Kmiecik does not make any conclusions regarding the speed of the

motorcycle, the angles of the jump, the behavior of the bike, or any other opinions

which would require the use of his knowledge of motorcycles.  In this case, the

accident scenario is not overly complicated and will be easily understood through

Hammes' testimony.  "Expert testimony may be properly excluded if the jury . . . is

equally able to draw the asserted conclusion."  Watkins v. Schriven, 52 F.3d 769,

772 (8th Cir. 1995).  This scenario functions to set the foundation for Kmiecik's

other opinions already excluded by the Court and will not be helpful to the jury.

17

Accordingly, the Court finds that Kmiecik's accident scenario does not comply

with Rule 702's requirement that expert testimony "assist the trier of fact" and is

excluded.

### 4.   <u>Jon Coleman</u>

According to Hammes, Jon Coleman is not testifying as an expert.  He is a

trained social worker, counselor, and licensed psychologist.  Coleman treated

Hammes and his family prior to and after the accident.  Based on this treatment

and observation, Coleman provided a letter to Hammes which was submitted to

Yamaha's counsel.  In that letter Coleman renders the opinion that Hammes has a

mild to moderate brain injury.  (Schleusner Aff. I. Ex. O.)

The parties agree that Coleman does not have the training or expertise to

render an opinion regarding any brain injury Plaintiff may have suffered.

Therefore, Coleman's opinion regarding brain injury is excluded.

Plaintiffs assert that Coleman should be allowed to testify about Hammes'

feelings relating to his inability to work and support his family.  Defendants argue

that this testimony will not be helpful to the jury because Hammes himself can

testify about his mental state before and after the accident.

The Court finds that Yamaha's argument is not an objection based on

Coleman's testimony as an expert, but is a more general relevancy dispute

regarding whether Coleman's testimony would be helpful.  This is an objection

more appropriately addressed at trial.  Thus, Coleman's testimony regarding traumatic brain injury is excluded and Defendants' objections regarding the relevancy of Coleman's general testimony should be made at trial.

### 5.   <u>Dr. Paul Estenson</u>

Estenson intends to testify regarding the present value of Hammes' economic loss.  This testimony will include estimates on Hammes' future and past earning capacity, employer-paid benefits and household services.

### a.   **Future and Past Earning Capacity**

Estenson is a trained economist with a Ph.D. in economics from the University of Nebraska-Lincoln.  He has taught college-level economics courses, worked in the research department of the Federal Reserve Bank of Minneapolis, and been a member of the research department of the Federal Reserve Bank of Minneapolis.  The parties agree and the Court is satisfied that Estenson is qualified to conduct an economic analysis on the present value of Hammes' economic loss.

The Court holds that Estenson's methodology and the reliability of his analysis are sufficient to allow him to testify as an expert in this case.

The methods employed by Estenson have been utilized by other economists.  Furthermore, Estenson's failure to employ a specific test, the "Worklife Estimates By Occupation" which assumes that individuals do not change careers, does not undermine the reliability of his methods.  See <u>Ruiz-Troche v.</u>

<u>Pepsi Cola</u>, 161 F.3d 77, 85 (1st Cir. 1998) ("<u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). Estenson's technique has been tested and employed by other expert economists; it has been subject to peer review; does not have a known rate of error; and is generally accepted in the economics community.

Further, Estenson's failure to incorporate factors such as the possibility of a previous injury does not undermine the reliability of his methods. Estenson asserts that he does not know of and Yamaha has not provided any published charts or studies in which these issues are used by an economist to determine the present value of economic loss. Even if relevant, the failure to include this information would be a challenge to the factual basis of Estenson's opinion and can be adequately addressed through cross examination during trial. Estenson admittedly did not include some relevant tax information in his initial report, but this oversite was due to the timing of discovery and the due date of the expert report and was corrected in an updated version of the expert report.

Yamaha also challenges the reliability of the Monte Carlo simulation used in rendering Estenson's opinion. A Monte Carlo simulation creates a large number of model estimates by selecting alternative values for the model's assumption. (Schleusner Aff. Ex. R.) The assumption values are selected from distributions of likely values which are specified by the analyst. (<u>Id.</u>) Estenson applied the Monte

Carlo simulation to assess the "statistical reliability of the estimates based on variation in the model's assumptions." (Id.)  Accordingly, the Monte Carlo simulation was used to verify the accuracy of Estenson's analysis, not as a tool to formulate his opinion.  The Court is not persuaded that Estenson's use of a tool to ensure accuracy in his report undermines in any way the reliability of his opinion.

Accordingly, Estenson's opinion satisfies the requirements of Rule 702 and will be allowed at trial.

### b.      Value of Household Services

The Court finds that Estenson has employed reliable methodology to arrive at an estimate of the value of Hammes' household services.  Although Estenson relied solely on self-reporting by Hammes, he also accounted for any possible inflation of that self-reporting.  Furthermore, Estenson's assumption that the value of Hammes' household services will increase over time does not undermine the reliability of his conclusions.  Yamaha may present competing expert testimony that the value should decrease over time at trial.  This is an issue of fact which goes to the weight of the evidence, not to admissibility.

### B.     <u>Summary Judgment</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted by the court if it can be shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(c).

The legal parameters of a summary judgment motion are well defined. While all evidence must be viewed in the light most favorable to the non-moving party, summary judgment is appropriate whenever the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The non-moving party may not rest on mere allegations or denials, but it must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-323.

Since this is a diversity case, the substantive law of Minnesota, the forum state, applies.  Gamradt v. Federal Lab., Inc., 380 F.3d 416, 419 (8th Cir. 2004).

**C.**     **Negligent Failure to Warn**

**1.**     **Pre-sale Duty to Warn**

Failure to warn cases under Minnesota law are based on a concept of negligence.  Bilotta v. Kelley Co., 346 N.W.2d 616, 623 (Minn. 1984).   A prima

facie case of negligence requires a plaintiff to show four elements: (1) that the defendant had a duty; (2) that the defendant breached that duty; (3) that the breach proximately caused the plaintiff's injuries; and (4) damages resulted. Funchess v. Cecil Newman Corp., 632 N.W.2d 666, 672 (Minn. 2001).

### a.     Duty

Under Minnesota law, a manufacturer has a duty to warn consumers of reasonably foreseeable dangers.  Huber v. Niagara Mach. & Tool Works, 430 N.W.2d 465, 467 (Minn. 1988).  A negligent warning case requires proof that the manufacturer was aware of the condition and risks associated with the product. Bilotta, 346 N.W.2d at 622.

Whether a manufacturer has a duty to warn is a question of law decided by the court.  Germann v. F.L. Smithe Mach. Co., 395 N.W.2d 922, 924 (Minn. 1986). However, the issue must be submitted to the jury "if there is a specific factual dispute concerning the defendant's awareness of the risk."  Huber, 430 N.W.2d at 467 (Minn. 1988); Lundgren v. Fultz, 354 N.W.2d 25, 28 (Minn. 1984);  Louis v. Louis, No. C3-00-1325, 2001 WL 15739 at *2 (Minn. Ct. App. Jan. 9, 2001) (unpublished) ("[I]t is a longstanding legal tradition in Minnesota that close questions of foreseeability be referred to the factfinder for resolution.")

In this case, whether the problems with the YZ125 motorcycle were foreseeable is a contested fact issue.  Yamaha asserts that it was not aware of any

potential problems with the motorcycle before Hammes' accident since it had

received no reports specifically relating to the YZ125 model and the testing

conducted in August 2000 concluded that the problems with the YZ250 were

caused by professional drivers' alteration of the throttle free play.  Hammes argues

that Yamaha was on notice of problems with the YZ125 throttles since the throttle

mechanism was the same in both models; Yamaha had received multiple

complaints regarding stuck throttles; a Yamaha employee testified that he

understood in September 2000 that there was a throttle problem with YZ

motorcycles; and Berke testified that in his expert opinion as a safety analyst, the

reports regarding the YZ250s were a "red flag" regarding the safety of other

Yamaha models using the same throttle design.  (Negishi Dep. 47; Berke Dep. 96.)

Accordingly, because there are factual disputes regarding the foreseeability of

problems with the YZ motorcycles, the Court follows the longstanding Minnesota

tradition of leaving close foreseeability questions to the jury.

Some courts have considered whether a separate duty to recall should be

imposed on manufacturers.  However, no Minnesota case has imposed a duty upon

manufacturers to institute a product recall or retrofit.  Berczyk v. Emerson Tool

Co., 291 F. Supp. 2d 1004, 1016 (D. Minn. 2003).  Furthermore, other courts have

opined that Minnesota would refuse to impose a duty to recall a defective product

"because the overwhelming majority of jurisdictions have rejected such an

obligation." <u>McDaniel v. Bieffe USA</u>, 35 F. Supp. 2d 735, 743 (D. Minn. 1999). Accordingly, this Court declines to impose a separate duty to recall and summary judgment is granted as to any failure to recall claims made by Hammes.

### b.      Breach/Damages

Yamaha does not contest that if a duty to warn consumers arose, then this duty was breached and damages resulted.  Accordingly, the Court determines that these two elements have been adequately pleaded to survive summary judgment.

### c.      Proximate Cause

All claims based on design defects, including negligent failure to warn theories of liability, require proof that the product at issue was defective and that the defect caused the plaintiff's injuries.  <u>Bilotta v. Kelly</u>, 346 N.W.2d 616, 622-23 (Minn. 1984).  Evidence that Yamaha recalled the throttle is a subsequent remedial measure and would not be admissible to prove the existence of a product defect in this case.  Fed. R. Evid. 407.  Therefore, the Court conducts the following analysis without considering the recall evidence.

In order to survive summary judgment, causation theories must be reasonably supported by available evidence, not speculation.  <u>Rients v. Int'l Harvester Co.</u>, 346 N.W.2d 359, 362 (Minn. Ct. App. 1984); <u>See</u> also <u>Harvest States Coop. v. Phillips & Temro Indus.</u>, No. C1-99-1784, 2000 WL 760423, at *2 (Minn. Ct. App. June 13, 2000) (unpublished opinion).  A plaintiff must do more than

show that an accident occurred and provide a plausible explanation for the

accident.  <u>Trost v. Trek Bicycle Corp.</u>, 162 F.3d 1004, 1009 (8th Cir. 1998);

<u>Hulstein v. Remington Arms Co.</u>, No. C9-93-109, 1993 WL 328773, at *2 (Minn. Ct.

App. Aug. 31, 1993) (unpublished).  In other words, a plaintiff in a product liability

case cannot establish his case via <u>res ipsa loquitur</u> and must instead provide

something more than evidence that the accident occurred to prove defect and

causation.  <u>Trost</u>, 162 F.3d at 1009.

The Minnesota Supreme Court has held that products liability cases require

a showing that the product defect caused the injury.  <u>Patton v. Newmar Corp.</u>, 538

N.W.2d 116, 119 (Minn. 1995); <u>Hauenstein v. Locite Corp.</u>, 347 N.W.2d 272, 276

(Minn. 1984) (holding that plaintiff must prove connection between failure to

warn and resulting injury).

The Court determines that Hammes has presented sufficient evidence of

causation to survive summary judgment.  At least six pieces of evidence support

Hammes' claim that his throttle malfunctioned.  First, Hammes' own testimony

describes that his throttle stuck upon initiating a jump.  Second, Lance Hammes'

testimony that the bike continued to rev after the crash is consistent with a theory

that the throttle stuck.  Third, Berke's expert testimony explains how a rotor works

and how the design made it possible for cable derailment.  Fourth, the results of

Berke's examinations of Hammes' bike revealed witness marks that he believes

were created when the throttle cable derailed.  Fifth, evidence of similar accidents

and complaints by consumers support a conclusion that Hammes' throttle was

defective.[2]  Sixth, the testimony of Scott Bailey that the throttle stuck on one other

occasion after he purchased Hammes' bike is evidence that Hammes' throttle was

defective and caused his accident.

### 2.    Post-sale Duty to Warn

Under very limited circumstances, Minnesota recognizes a post-sale duty to

warn.  The post-sale duty to warn arises only in "special cases."  <u>Hodder v.</u>

<u>Goodyear Tire & Rubber Co.</u>,426 N.W.2d 826, 833 (Minn. 1988).  The <u>Hodder</u>

court, the first court to recognize a post-sale duty to warn, did not articulate a test

for determining when such a duty applies.  <u>Id.</u>  Instead, after discussing a number

of factors, it simply concluded that a duty to warn did exist in that case.  <u>Id.</u>

Among the factors that the court considered were: the length of time that

---

[2]Evidence of other injuries or incidents is relevant to prove the product's
lack of safety or a party's notice of defects.  <u>Lovett v. Union Pac. R.R.</u>, 201 F.3d
1074, 1081 (8th Cir. 2000).  However, because other incident evidence is
extraneous, may confuse the jury, and may be more prejudicial than probative,
the proponent of such evidence must first prove that the incidents are
"substantially similar."  <u>J.B. Hunt Transport v. General Motors Corp.</u>, 243 F.3d
441, 445 (8th Cir. 2001).  Based on the evidence available, the Court is unable to
conclude whether evidence of other accidents is admissible.  As the Court
determines that Hammes has presented sufficient evidence of causation to survive
summary judgment without evidence of other incidents, this determination will
be left for trial.

Goodyear was aware of problems with its product, that the injuries which occurred resulted in serious bodily injury, that Goodyear continued in the tire business and continued to advertise and sell the product for many years, that Goodyear continued to service its products and maintained some continuous contact with consumers, and that Goodyear undertook a duty to warn of the product's dangers. Id. Other cases interpreting Hodder have also considered whether the dangers would be hidden or unknown to the user. McDaniel v. Bieffe, 35 F. Supp. 2d 735, 740 (D. Minn. 1999).

The Court finds that Hammes' post-sale duty to warn claims must be dismissed. These circumstances are not those under which the Minnesota Supreme Court would impose a post-sale duty to warn. The Hodder factors all turn on direct indifference to a known problem and to serious bodily injury. Here, however, the facts show that Yamaha did institute tests immediately upon learning of the first problems and responded with a recall very quickly after general consumer complaints. Unlike Goodyear, Yamaha had notice of potential throttle problems at the very most one year before the accident. Further, whereas Goodyear had received notice of significant injuries and deaths, in this case Yamaha's first notice of any injury was received just one month before Hammes' accident. Finally, the Court finds that this case differs from Hodder because Yamaha never undertook a duty to warn of the throttle risk. Thus, the Court does

not find the special circumstances which trigger a post-sale duty to warn in Minnesota to exist in this case.  Therefore, summary judgment is granted on Hammes' post-sale duty to warn claim.

### 3.    Duty to Perform Recall with Due Care

Minnesota courts recognize that even in circumstances where no duty to recall exists, once a recall has been undertaken, a duty to perform that recall with due care arises.  "One who voluntarily undertakes to perform an act he is not bound to do must use due care in the performance of the action, or be held liable for the harm that results."  Isler v. Burman, 232 N.W.2d 818, 822 (Minn. 1975).

Hammes, however, cannot succeed on any claim relating to a negligent performance of the recall since his accident occurred prior to the recall, making the satisfaction of the causation element impossible.  Therefore summary judgment is granted as to any claims based on negligent performance of the recall.

### D.    Product Liability Claims

Under Minnesota law, theories of negligence, design defect and breach of implied warranty merge into a single theory of strict liability in products liability cases.  Bilotta v. Kelly Co., 346 N.W.2d 616, 623 (Minn. 1984).  To survive summary judgment, the plaintiff in a products liability case must establish a genuine issue of material fact as to each of the three elements of a strict liability claim: (1) that the subject product was in a defective condition unreasonably

dangerous for its intended use; (2) that the alleged defect existed when the product left the defendants' control; and (3) that the alleged defect was the proximate cause of the plaintiff's injury.  Id. at n.3.

These elements are common to strict liability, negligence, and breach of warranty.  Wolden v. Gangelhoff, 241 N.W.2d 650, 651 (Minn. 1976.)  "A defect is any condition not contemplated by the user which makes the product unreasonably dangerous to him."  Holowaty v. McDonald's Corp., 10 F. Supp. 2d 1078, 1086 (D. Minn. 1998) (citation omitted).  The plaintiff must do more than proffer evidence that is "merely consistent with his theory; [he] must go further and support it."  Rohwer v. Federal Cartridge Co., No. 03-CV-02872, 2004 WL 2677200, at *3 (D. Minn. Nov. 18, 2004) (unpublished opinion) (citing Peterson v. Crown Zellerbach Corp., 209 N.W.2d 922, 923-34 (Minn. 1973)).  In a strict liability action, the plaintiff may use circumstantial evidence to prove the defective condition.  Western Surety & Cas. Co. v. General Elec. Co., 433 N.W.2d 444, 447 (Minn. Ct. App. 1988).

Hammes has alleged genuine issues of material fact regarding the elements of a strict liability claim.  Hammes was using his motorcycle for its intended use on a motocross track.  He was not using the bike in an unreasonable manner; in fact, Yamaha concedes that the jump Hammes took was smaller than one in which they would expect throttle derailment to occur.  Hammes' bike was less than two

30

months old, and the throttle was not altered, modified, or disassembled, creating a

presumption that the throttle was in the alleged defective condition when it left

Yamaha's control.  Finally, as detailed above, Hammes has alleged sufficient

material factual disputes to survive summary judgment on causation.  Therefore,

Hammes has created a material factual dispute on each element of negligence,

design defect, and breach of warranty under Minnesota law and Yamaha's motion

for summary judgment as to these claims is denied.

### E.   Express Warranty

To survive a motion for summary judgment on a theory of breach of an

express warranty, a plaintiff must be able to identify an express warning at issue

and prove that he reasonably relied upon it.  Peterson v. Bendix Home Sys., 318

N.W.2d 50, 52-53 (Minn. 1982).

Hammes has identified no specific warranty upon which he bases his case.

When asked through interrogatories to identify any express warranties, Hammes

responded that:

> Defendants impliedly and expressly warranted to customers
> that the Motorcycle conformed to promises, was merchantable and fit
> for ordinary purposes, was fit for particular purposes, was free from
> defects and was in no way dangerous or unsafe to prospective users.

(Pl.'s Resp. Def.'s First Set of Interrogs. No. 26.)  An implied warranty of

merchantability is defined as requiring goods "to be fit for the ordinary purposes

for which such goods are used." <u>Peterson</u>, 318 N.W.2d at 53.  Thus, the Court

finds that Hammes' statement alleges only an implied warranty of merchantability

and does not allege an express warranty.  Accordingly, summary judgment is

granted as to any claims based on an express warranty.

   **F.**      **<u>Loss of Consortium</u>**

   Plaintiff Jean Feehan asserts a claim for loss of consortium relating to

Hammes' accident.  Under Minnesota law, a claim for loss of consortium is a

derivative action and does not exist independent of the injured spouse's right to

maintain an action for the injuries sustained.  <u>Thill v. Modern Erecting Co.</u>, 170

N.W.2d 865, 869 (Minn. 1969); <u>See</u> <u>Alholm v. O'Bryan Law Ctr.</u>, No. 98-1987,

2000 WL 1196202 at *3-4 (D. Minn. Mar. 27, 2000).  As such, a spouse cannot

recover for loss of consortium unless the injured spouse recovers from the same

defendant.  <u>Thill</u>, 170 N.W.2d at 869.  As Feehan's claims for loss of consortium

are derivative of Hammes' claims, they remain insofar as Hammes' claims survive

and are dismissed insofar as Hammes' claims are dismissed as set forth above.


Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

   1.   Defendants' Motion to exclude expert testimony [Docket No. 66] is

        **GRANTED IN PART** and **DENIED IN PART** as set forth in this

memorandum;

    a.       Motion to exclude testimony of Lanny R. Berke is **GRANTED IN PART AND DENIED IN PART**;

    b.       Motion to exclude testimony of Gary Kmiecik is **GRANTED**;

    c.       Motion to exclude testimony of Jon Coleman is **DENIED**;

    d.       Motion to exclude testimony of Dr. Paul Estenson is **DENIED**.

2.       Defendants' Motion for Summary Judgment [Docket No. 72] is **GRANTED IN PART** and **DENIED IN PART** as set forth in this memorandum.

    a.       Count I-Negligence remains only as to pre-sale duty to warn claims;

    b.       Count II-Strict Liability remains only as design defect claims;

    c.       Count III-Breach of Warranties remains only as to breach of implied warranties claims;

    d.       Count IV-Loss of Consortium remains only as to those claims of Frank Hammes that have not been dismissed.

Dated: May 4, 2006                  s / Michael J. Davis

                                         Judge Michael J. Davis

                                         United States District Court